FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

98 JAN 22 PH 12: 31

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **MILFORD ESTES**, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ] CV 96-N-3361-S |
| | ] |
| **PROVIDENT INDEMNITY LIFE** | ] |
| **INSURANCE COMPANY, et al.**, | ] |
| | ] |
| Defendant(s). | ] |

ENTERED

JAN 2 2 1998

## Memorandum of Opinion

Plaintiff Milford Estes ("Estes") filed this action against defendants Provident Indemnity Life Insurance Company ("PILIC") and National Financial Insurance Company ("NFIC") in the Circuit Court of Jefferson County, Alabama, on or about November 22, 1996. *Complaint* at 1-3. Estes asserted claims, pursuant to the laws of the State of Alabama, for breach of contract, bad faith, intentional infliction of emotional distress, negligence, fraud and outrage. *Id.* at 3-7. On December 24, 1996, defendants timely removed the case to this court based upon diversity jurisdiction. *Notice of Removal* at 1. Subsequently, this court dismissed Count VI of Estes's complaint as to his claim for outrage. *Order*, entered Jan. 6, 1997.

The court has for consideration separate motions for summary judgment by defendants PILIC and NFIC as to all claims against each of them. The motions are fully briefed and are ripe for decision. After due consideration, they are both due to be granted in part and denied in part.

56

I.     **Statement of Facts.**[1]

      **A.     Estes's Case Against PILIC.**

    Estes assumed that the hospital would handle filing a claim for the expenses he incurred while hospitalized in January 1996. *Estes Deposition* at 33. Therefore, he took no action on his claim with PILIC for medical expenses from his hospitalization until approximately one or two months after his discharge from the hospital. His first action was to fill out a claims form at PILIC's request and to forward it to PILIC. *Id.* This was Estes's only written correspondence to PILIC, although he went to the hospital approximately once per month over six to eight months and called PILIC on several occasions. *Id.* at 52.

    Estes received several statements from the hospital and doctors who cared for him. *Estes Deposition* at 37.   Around March or April 1996, Estes received statements from his emergency room treating physician, the ambulance service, his physician's office and the hospital stating that their bills had not been paid. *Id.* at 35. Every time Estes would get one of these statements, he would call both PILIC and NFIC; also, Estes went to the hospital each time he received a statement for his hospitalization charges. *Id.* at 35-36, 52. Estes went to the Department of Public Safety to inquire about the ambulance service bill, and he went to the physician's office to inquire about that bill. *Id.* at 54. Estes did not visit the office of his emergency room physician because that bill had already been turned over to a collection agency. *Id.* at 54.

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

2

On approximately April 2, 1996, PILIC received its first bill from the hospital for Estes's January hospitalization. *Marcozzi Deposition* at 29. On May 22, 1996, PILIC's claims approver, Ruth Rhoadamer, reviewed the bill. *Id.* at 33-34, 35-36. She determined that, because the bill exceeded $5,000.00 in amount, PILIC needed an itemized bill from the hospital. *Id.* On that same day, Rhoadamer filled out the request form, mistakenly asking for the hospital medical records instead of an itemized statement. *Id.* at 34. On June 17, 1996, when the file came up for review, claims approver, Patti Stitz, noticed the mistaken request for medical records. *Id.* at 42. At that time, Stitz sent a request to the hospital for an itemized statement of Estes's charges. *Id.* at 42.

The PILIC claims department sent two letters to Estes, both dated July 15, 1996. *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order* [in opposition to PILIC's motion for summary judgment] ("*Response I*") at Exhibits C & D. The first letter stated as follows:

> The information indicated below [indicating "complete medical records"] was previously requested on 06-17-96 so that benefits can be properly determined for the above named patient [indicating Estes]. An authorization for release of information was attached to our original request. Your prompt response would be greatly appreciated as benefits are pending the receipt and review of this information. A self-addressed return envelope is enclosed for your convenience. *Id.* at Exhibit D.

This request for medical records was an error, just like the request by Rhoadamer to the hospital. *Marcozzi Deposition* at 53. After receiving this letter, Estes went to the hospital to inform it of this request. *Estes Deposition* at 43-44.

Several days later, Estes received the second letter, also dated July 15, 1996, which stated as follows:

3

> As you were previously notified, additional information was requested from BLOUNT MEMORIAL HOSP.. [sic] To date, the information has not been received.
>
> We have submitted a second request to BLOUNT MEMORIAL HOSP., however, if this information is not received in our office within the next three weeks, the file will be removed from active consideration. Please contact the provider and help us obtain this information so that your claims can receive our immediate attention.
>
> Should you have any questions, please contact this office for assistance. *Response I* at Exhibits C.

*See Estes Deposition* at 48.  Although PILIC never notified Estes that the letters were sent erroneously, after receiving the second letter, Estes took no further action because he believed the first letter negated the second letter. *Id.* at 49; *Marcozzi Deposition* at 55-56.

Estes telephoned PILIC on occasion to inquire about his claim, and PILIC informed him that it was processing his claim and that it would take care of his claim as soon as possible. *Estes Deposition* at 60-62.  Although Estes felt that he was being "put off," PILIC never told him, either by phone or in writing, that his claim would not be paid.  *Id.*  Estes testified that he understood that his claim would be paid in accordance with the terms of his policy, and Estes assumed that PILIC would eventually, after processing, pay his claim.  *Id.*

On July 17, 1996, PILIC received an itemized statement of Estes's charges from the hospital. *Response I* at Exhibit D.  On August 8, 1996, when Estes's claim came up for follow-up at PILIC, Patti Stitz re-requested by phone the itemized bill, which was faxed later that day by the hospital to PILIC. *Marcozzi Deposition* at 63.  At that time, Stitz was not aware that the itemized bill was already in-house at PILIC, having been received on July 17, 1996, because it had not been manually matched to the file. *Id.*

4

According to PILIC, during this time frame, PILIC's claims department experienced a backlog of claims due to a higher volume of claims than anticipated. *Id.* at 64-65. Also before December 1996, the "pending letter request process" was manual at PILIC, not automated. *Id.* When PILIC received information, personnel had to manually match it to the claims file to which it belonged. *Id.* This sometimes took up to four weeks due to the backlog situation. *Id.*

On August 8, 1996, Estes's file was sent to Debbie Kahn, PILIC claims approver, who determined the claim payable. *Id.* at 65-68. In addition, however, Kahn determined that the file should be sent to Multi-Plan, Inc. ("Multi-Plan"), a re-pricing network utilized by PILIC to determine if a contract existed between Multi-Plan and the hospital in order to obtain a discount on the bill, if possible. *Id.* According to PILIC, if a discount on a bill is available, savings on the bill results in a lower insurance rate to an insured as well as lower out-of-pocket cost for the insured, depending on their deductible amounts. *Id.* at 68-69.

Around August 19, 1996, PILIC faxed the bill to Multi-Plan. *Id.* at 65-67. Although PILIC usually gets an answer from Multi-Plan in two weeks, PILIC did not receive notice until October 24, 1996. *Id.* at 70. Estes asserts that no one from PILIC contacted Multi-Plan to find out why it was taking longer than the usual two week period to make the determination. *Marcozzi Deposition* at 71.[2] While PILIC admits that no notation in the file documents any follow-up, the Clerical Department at PILIC usually calls Multi-Plan in this situation. *Id.* at 71. On October 24, 1996, Multi-Plan informed PILIC that no contract existed

---

[2] PILIC also cites page 74 of Marcozzi's deposition in support of this proposition, but PILIC failed to provide the court with that page. *Response I* at Exhibit A.

between Multi-Plan and the hospital during the time of Estes's hospitalization, so that no discount was available. *Id.* at 70.

Around November 8, 1996, after receipt of notice from Multi-Plan, the Estes claim was sent to PILIC claims approver, John Crognale, for processing and payment. *Id.* at 74, 76-77. This audit, requiring about twenty minutes, is essentially the same audit performed previously by Kahn, but it differs from the review by Rhoadamer because it involves review of the itemized charges. *Id.* at 75-76. Because the claim exceeded $5,000.00, PILIC required Estes's claim to be audited. *Id.* The auditor performing the audit discovered a coding error and returned the claim file to Crognale. *Id.* at 78.

Due to the amount of the bill exceeding $5,000.00 and the fact that Crognale's draft authority does not include that amount, the claim was then sent to Dorothy McDougal for audit. *Id.* McDougal found a coding and calculation error and sent the claim back to Crognale for correction. *Id.* On November 21, 1996, Crognale corrected the errors and returned the claim to McDougal for final audit, again due to the limitation on his draft authority. *Id.* at 83.

On November 25, 1996, the auditor released the Estes claim to the check printing personnel, and PILIC mailed payment the following day. *Id.* at 89. PILIC also mailed an Explanation of Benefits to Estes, notifying and explaining the payment made by PILIC. *Id.* at 94; *Movant's Initial Submission in Response to Exhibit D of the Court's Order* [in support of PILIC's motion for summary judgment] at Exhibit E. PILIC received service of process in this action on December 6, 1996. Karen Marcozzi, corporate representative for PILIC,

6

testified that PILIC had no knowledge of Estes's lawsuit against it when it paid his claim. *Marcozzi Deposition* at 90. Estes offers no evidence to dispute this fact.

PILIC agrees that the time it took to process Estes claim, from March, 1996, until November, 1996, was "longer than desired time frame." *Id.* at 105. Since it processed Estes's claim, PILIC has completely reorganized its claims department because it believed it was not servicing its clients as it should. *Id.* Today, PILIC responds within eight to eleven days of the time claims are submitted because it has an automated letter processing system and it has revamped its clerical department so that claims and other items are adjusted immediately upon receipt. *Id.* at 116. Today, if PILIC does not receive an itemized bill from a provider after its first request, PILIC automatically sends a second request within twenty-one days . *Id.* at 119. Presently, PILIC processes claims within three to four months if it does not have a backlog and if it receives all necessary information; this comports with the standard period of time in the insurance industry. *Id.* at 105-06.

**B.   Estes's Case Against NFIC.**

Estes's insurance policy with NFIC obligated it to pay eligible medical expenses, and the policy did not contain a coordination of benefits provision. *Opponent's Amended Responsive Submission in Response to Exhibit D of the Court's Order* [in opposition to NFIC's motion for summary judgment] ("*Response II*") at Exhibit B; *Kober Deposition* at 174. Under the provisions of the Estes's policy with NFIC, a claim is to be paid as soon as NFIC receives written proof of loss.[3] *Response II* at Exhibit B.

---

[3] Estes's insurance contract with NFIC states, "Indemnities payable under this policy will be paid as we receive written proof of loss." *Response II* at Exhibit B, p.17.

7

On January 17, 1996, NFIC first received notice of Estes's claim for his hospitalization when it received the statement of charges from the hospital. *Kober Deposition* at 13-14. [4] Upon receipt of the statement of charges, a claims examiner at NFIC reviewed the statement to determine whether NFIC needed additional documents in order to process and pay the claim. *Id.* at 20, 88-89. NFIC determined that it needed (1) an itemization of charges and (2) Estes's medical records.[5] *Id.* at 90.

On February 21, 1996, NFIC received an itemization of charges from the hospital. *Id.* at 76-77. Estes's medical records, however, took longer to arrive. In the normal course of business, NFIC would request the medical records from the provider by letter.[6] *Id.* at 90. In this case, NFIC requested Estes's medical records from an outside vendor, Equifax, by

---

[4] Estes cites pages 12 through 14 of Konrad Kober's deposition in support of this proposition, but Estes only submitted pages 13 and 14 in his evidentiary submission in opposition to NFIC's motion for summary judgment. *Response II* at Exhibit C. Furthermore, NFIC did not include page 12 of Kober's deposition transcript in its additional evidentiary material, filed October 6, 1997, to which Estes objects anyway. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A; *Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997.

[5] Estes claims, without evidentiary support, that this determination by NFIC was based on a "purely subjective standard." *Response II* at 3. Estes cites the deposition of Konrad Kober at pages 80, 81 and 127, but Estes does not include these pages in his opposition to NFIC's motion for summary judgment. *Id.* at Exhibit C. Furthermore, NFIC did not include these portions of Kober's deposition transcript in its additional evidentiary material, filed October 6, 1997, to which Estes objects anyway. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A; *Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997.

In response to Estes's claim, NFIC asserts that, although NFIC does not maintain a document designated as a "procedures" manual, claims examiners receive a manual in training and receive instructions to evaluate claims in accordance with terms and conditions of the particular policy involved. *Reply II* at 3.

[6] Estes claims that, in the normal course of business for NFIC, it would maintain a copy of the letter requesting the medical records in its files, citing Konrad Kober's deposition at page 96 in support of this proposition. *Response II* at 3. However, Estes failed to provide page 96 of Konrad Kober's deposition in his opposition to NFIC's motion for summary judgment. *Response II* at Exhibit C. Also, NFIC did not include these portions of Kober's deposition transcript in its additional evidentiary material, filed October 6, 1997, to which Estes objects anyway. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A; *Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997.

According to the portions of Kober's testimony that were submitted to the court, NFIC notified Estes by form letter (referred to as "document 37") dated February 8, 1996, that NFIC had requested his medical records from the hospital. *Kober Deposition* at 85-86.

electronic submission on April 3, 1996.[7]  *Id.* at 93-94.   On April 8, 1996, NFIC received notice from Equifax that the hospital would not release Estes's records because it needed a medical claim form signed by Estes.  *Id.* at 106-07, 111.  NFIC claims, without evidentiary support, that it received the required signed medical claim form from Estes on April 22, 1996. *Movant's Reply Submission in Response to Exhibit D* [NFIC's reply to its motion for summary judgment] ("*Reply II*") at 2.  On May 2, 1996, NFIC requested Estes's medical records directly from the hospital.[8]  *Kober Deposition* at 97.

On March 18, 1996, NFIC received a statement of charges for the services of Dr. Joseph White ("Dr. White"), Estes's treating physician. *Id.* at 133.  Estes claims that NFIC waited until October 2, 1996, to contact Dr. White for Estes's medical records.  *Id.* at 98. However, Konrad Kober ("Kober"), NFIC's corporate representative, testified that the phone record of the request to Dr. White on October 2, 1997, indicates that NFIC had made a prior written request to Dr. White.  *Id.* at 98-99.

On October 8, 1996, after receiving the medical records from Dr. White, NFIC had all the required medical records and itemized charges needed to process Estes's claim.  *Id.*

---

[7] Estes alleges this fact, and NFIC admits it, despite the absence of evidentiary support in Estes's evidentiary submission in opposition to NFIC's motion for summary judgment. *Response II* at 3 (citing Exhibit C at 93); *Movant's Reply Submission in Response to Exhibit D* [NFIC's reply to its motion for summary judgment] ("*Reply II*") at 2.  The only evidentiary support in the record for this proposition is found in NFIC's additional evidentiary material, filed October 6, 1997, to which Estes objects.  *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A; *Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997.

[8] Estes asserts that "[t]he first direct request by Defendant NFIC to the Hospital for medical records was on May 2, 1996, almost five months after Defendant NFIC first had notice of the claim." *Response II* at 4 (citing *Kober Deposition* at 97); *Reply II* at 2.  The only evidentiary support of this fact, however, is in the additional evidence, filed by NFIC on October 6, 1997, to which Estes objects. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A, pp. 106-07, 111; *Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997.

9

at 63. However, Kober testified that, at that point, NFIC needed information about Estes's other health insurance coverage.[9] *Id.* at 132-33. NFIC first contacted PILIC in this regard, by a voice-mail message, on September 26, 1996.[10] *Id.* at 146-47, *Response II* at Exhibit D. NFIC made no specific inquiry as to dual coverage or coordination of benefits on this voice-mail. *Response II* at Exhibit D. Nevertheless, on October 16, 1997, NFIC received the requested information about Estes's coverage from PILIC. *Kober Deposition* at 163.

Kober testified that NFIC processed payment of Estes's claims on November 11, 1996, and November 18, 1996.[11] *Affidavit of Kober* at ¶ 4. These also included payment of a claim for treatment at the hospital on July 9 and 10, 1996. *Id.* at ¶ 3. The hospital received NFIC's payment of Estes's claim on November 25, 1996.[12] *Response II* at Exhibit A.

---

[9] Estes further states, "Like Defendant NFIC's earlier claims-handling decisions, the decision to obtain information from Provident was based on a non-written policy or non-objective standard of handing duplicate coverage." *Response II* at 4. Estes cites Kober's deposition at pages 139 and 140, but Estes does not provide the cited evidence in its opposition to NFIC's motion for summary judgment. *Response II* at Exhibit C.

NFIC responds that, although NFIC does not maintain a document designated as a "procedures" manual, claims examiners receive a manual in training and receive instructions to evaluate claims in accordance with terms and conditions of the particular policy involved. *Reply II* at 3. This, according to NFIC, is an "objective" standard. *Id.* However, NFIC cites no evidentiary support for its claim. *Id.*

[10] Estes cites Kober's deposition testimony at pages 55 and 56 for the proposition that "[d]efendant NFIC now asserts that the payment of Plaintiff Estes's claim depended on another factor: Information from Provident Indemnity Life Insurance Company (hereafter referred to as 'Provident') with whom Plaintiff Estes had a major medical policy (hereafter the 'Provident policy')." *Response II* at 3. However, Estes does not provide the cited evidentiary support in his opposition to NFIC's motion for summary judgment. *Id.* at Exhibit C.

On the other hand, NFIC provides exerts from Kober's testimony at pages 55, 132 and 173, which supports the contention that NFIC needed information about Estes's major medical coverage, but to which Estes objects. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A; *see also Reply II* at 3; *Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997.

[11] Estes alleges, without any evidentiary support, that NFIC paid Estes's claim after the hospital had informed NFIC about its alleged suggestion to Estes that he seek legal advice. *Response II* at 6. Estes cites the affidavit of Cindy Daily and attached itemized charges from the hospital in support of this allegation. *Id.* However, this evidence is not even remotely related to Estes's allegation. *See Response II* Exhibit A.

[12] Estes contends that, according to a running report kept by NFIC, NFIC processed and paid sixty-five to seventy percent of claims in 1997 within thirty days or less. *Response II* at 5. Estes cites the deposition of Konrad Kober at page 22 in support of this proposition; however, Estes failed to submit page 22 in his opposition to NFIC's motion for summary judgment. *Id.* at Exhibit C. Also, NFIC did not include these portions of Kober's

10

Estes indicated in his application for insurance with NFIC that he also carried insurance with PILIC. *Id.* at 41-42. However, Estes indicated on his NFIC application that he would terminate his coverage by PILIC. *Id.* at 49-50. This was the basis upon which NFIC issued its coverage to Estes. *Id.* On April 22, 1996, NFIC discovered that Estes's PILIC policy was still in force. *Id.* 49-50. Although it never notified Estes or any health care provider, NFIC contends that it had the right to rescind its policy based upon this misrepresentation by Estes. *Id.* at 49-51. Rather than rescind and return Estes's premiums, however, NFIC "just decided to pay the benefits and go on." *Id.* at 171. Estes's over-insurance in this case resulted in payments from both defendants, NFIC and PILIC, totaling more than $25,000.00 on claims of approximately $15,000.00, resulting in a windfall to Estes and/or his health care providers of approximately $10,000.00. *Kober Deposition* at 131-32.[13]

## II.   Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

deposition transcript in its additional evidentiary material, filed October 6, 1997, to which Estes objects anyway. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A.

Estes also contends that, "thirty to forty-five days is sufficient time to pay the claim." *Id.* at 5. Estes cites the deposition of Konrad Kober at page 24 in support of this proposition; however, Estes failed to submit page 24 in his opposition to NFIC's motion for summary judgment. *Id.* at Exhibit C. Also, NFIC did not include these portions of Kober's deposition transcript in its additional evidentiary material, filed October 6, 1997, to which Estes objects anyway. *Motion to Allow Additional Deposition Excerpts*, filed Oct. 6, 1997, at Exhibit A.

[13]NFIC submitted evidence of this overpayment with its reply to Estes's opposition to NFIC's motion for summary judgment. *Reply II* at Exhibit A. NFIC's motion to allow additional deposition excerpts, which accompanied this submission, is opposed by Estes. *See Plaintiff's Response to Defendant NFIC's Motion to Allow Additional Deposition Excerpts*, filed Oct. 15, 1997; *Opponent's Response to Movant's Additional Evidentiary Material*, received Nov. 4, 1997. While this evidence is undisputed, it also is not material to the issues before the court on summary judgment.

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

12

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the

13

facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   Discussion.

### A.   Defendant Provident Indemnity Life Insurance Company.

#### 1.   Breach of Contract.

Estes alleges that PILIC breached the insurance contract between them. *Complaint* at ¶¶ 5-12. He seeks compensatory damages, including compensation for mental anguish, and punitive damages. *Id.* at ¶¶ 11-12. In Alabama, a breach of contract occurs when one party fails to perform any promise forming the whole or part of the contract. *Seybold v. Magnolia Land Co.*, 376 So. 2d 1083, 1084 (Ala. 1979). PILIC never denied or refused to pay benefits under the insurance contract between it and Estes. However, under the contract, PILIC promised that "[a]ll benefits payable under the Policy shall be payable within sixty (60) days after receipt of proof of loss." *Response I* at Exhibit G, p. 37.

Estes submitted a claims form to PILIC and PILIC received a bill from the hospital on or before April 2, 1996. On July 17, 1996, PILIC received an itemized statement from the hospital. On October 24, 1996, PILIC received notice that Estes was not entitled to a discount on his hospital bill. Then, on November 25, 1996, PILIC paid Estes's claim in full. Therefore, based upon the evidence before the court, summary judgment in favor of PILIC is not appropriate on the issue of whether PILIC breached the explicit terms of its contract with Estes, which provides that claims are payable within sixty days of proof of loss.

14

Irrespective of the sixty-day provision in the contract, Estes argues that PILIC "has an obligation to pay all claims under the policy and to do so without unreasonable delay." *Response I* at 12 (citing *United Ins. Co. of America v. Cope*, 630 So. 2d 407, 411 (Ala. 1993)). However, under Alabama law, an "insurance contract must be enforced as written, and the court cannot defeat expressed provisions by rewriting the contract nor by judicial interpretation." *Gardner v. Union Nat'l Life Ins. Co.*, 780 F. Supp. 792, 794 (M.D. Ala. 1991); *accord Lipscomb v. Reed*, 514 So. 2d 949 (Ala. 1987); *Smith v. Auto-Owners Ins. Co.*, 500 So. 2d 1042 (Ala. 1986); *Turner v. United States Fidelity & Guar. Co.*, 440 So. 2d 1026 (Ala. 1983).

Estes relies upon *United Ins. Co. of America v. Cope* for the proposition that the terms of his contract with PILIC include an obligation to pay his claim "without unreasonable delay." 630 So. 2d 407, 411 (Ala. 1993). In *Cope*, however, the insurance company denied its insured's claim, rather than delaying payment, which is all Estes alleges in this case. *Id.* Also, in *Cope*, the insured brought suit under a theory of bad faith failure to pay a valid insurance claim, rather than breach of contract. *Id.* Therefore, for the purposes of Estes's breach of contract claim, based upon *Cope*, this court cannot insert an obligation to pay "without unreasonable delay" into the written agreement between these parties.

Estes also relies upon *Pate v. Rollison Logging Equip., Inc.*, 628 So. 2d 337 (Ala. 1993), for the proposition that summary judgment is inappropriate whenever there is a dispute over the "reasonableness" of a delay in payment of an insurance claim. *Response I* at 16. However, the Alabama Supreme Court, in Pate, limited its holding to credit disability insurance because of its "special nature," being a type of insurance purchased specifically

15

in order to avoid default on a loan. *Id.* at 345. Therefore, the rule in *Pate* does not apply to Estes's contract for payment of health care costs.

Finally, Estes relies upon *Hackleburg Church of Christ v. Great American Ins. Co.*, 675 So. 2d 1309, 1311 (Ala. Civ. App. 1995) for the proposition that the "reasonableness" of any delay in payment of claims is a question for the jury. *Response I* at 16. However, *Hackleburg* involves the "reasonableness" of a seven year delay by the insured giving notice of a claim for storm damage to its insurer when the explicit terms of the contract required "immediate" notice. *Id.* This case is so factually dissimilar to the case at bar as to have no precedential value for Estes's breach of contract claim. Therefore, for the purposes of Estes's breach of contract claim, based upon Alabama law, the court will not insert into the explicit written agreement between the parties a condition that claims be paid "without unreasonable delay."

Estes seeks to recover damages for mental anguish allegedly resulting from a delay in payment of his claim. The general rule in Alabama is that plaintiffs may not recover for mental anguish in an action for breach of contract. *United States Auto Ass'n v. Wade*, 544 So. 2d 906, 913 (Ala. 1989); *Aetna Life Ins. Co. V. Lavoie*, 505 So. 2d 1050, 1056 (Ala. 1987); *Vincent v. Blue Cross-Blue Shield of Ala. Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979); *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Smith*, 406 So. 2d 913, 916 (Ala. Civ. App. 1981), *cert. denied*, 406 So. 2d 916 (Ala. 1981). The exception to the no recovery rule occurs where "the contractual duties imposed by this contract are so coupled with matters of mental solicitude as to the duty that is owed, that a breach of that duty will necessarily or reasonably result in mental anguish." *Independent Fire Ins. Co. v. Lunsford*, 621 So. 2d 977, 979 (Ala. 1993).

16

*Lunsford* involved a denial or refusal to pay an insurance claim for property damage. *Id.* In this case, however, PILIC never denied or refused to pay Estes's claim. Unlike *Lunsford*, this action only involves an alleged delay in payment. Estes never had any reason to believe that PILIC would not eventually pay his claim. In fact, PILIC reassured Estes that, once it completed processing his claim, it would be paid. Estes even admits that, while he felt "put off," he assumed that PILIC would eventually pay his claim in full. Therefore, under Alabama law, Estes is not due to recover mental anguish damages on his breach of contract claim against PILIC.

Estes seeks punitive damages on his breach of contract claim. In Alabama, "[i]t is a well settled principle of law that damages for a breach of contract are the amount of the loss suffered by the party harmed by the breach." *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 344 (Ala. 1997). "Moreover, . . . contract damages are limited to those flowing naturally and proximately from the breach[,] and . . . their purpose is to put the injured party in the position he should have been in but for the breach. *Id.* Therefore, although punitive damages are available where fraud and breach of contract are combined, they are not available where a "breach of contract claim is not coupled with a legitimate fraud claim." *Id.* at 345.

In this case, as discussed below, Estes has presented no evidence or legal argument in response to PILIC's motion for summary judgment upon which a reasonable jury could find in favor of Estes on his fraud claim against PILIC. *See infra* at III-A-5. Therefore, under Alabama law, Estes is not entitled to punitive damages on his breach of contract claim against PILIC.

17

In summary, judgment as a matter of law in favor of PILIC is not appropriate on Estes's breach of contract claim against PILIC. However, based upon Alabama law, the court will not insert a condition to pay "without unreasonable delay" into the written agreement between the parties. Furthermore, Estes is not entitled to mental anguish damages or punitive damages on his breach of contract claim. Therefore, if Estes can prove a breach of the explicit terms of his contract with PILIC, then he is due to recover his actual damages, exclusive of any claim for mental anguish.

### 2. Bad Faith.

Estes asserts a claim for bad faith against PILIC for its alleged delay in payment of his insurance benefit. *Complaint* at ¶¶ 13-16. In Alabama, "[t]he tort of bad faith is an extreme remedy that applies only in extreme circumstances concerning an unexcused failure to process a claim or to pay policy benefits." *ALFA Mut. Ins. Co. v. Northington*, 604 So. 2d 758, 760 (Ala. 1992). Proof of mere negligence or a mistake on the part of the insurer is not sufficient to support a claim for bad faith under Alabama law. *Davis v. Cotton States Mut. Ins. Co.*, 604 So. 2d 358, 359 (Ala. 1992); *King v. National Foundation Life Ins. Co.*, 541 So. 2d 502 (Ala. 1989).

Under Alabama law, the tort of bad faith requires the plaintiff to prove each of the elements of a prima facie case as follows:

(a)    the existence of an insurance contract between the parties and a breach thereof by the defendant;

(b)    an intentional refusal to pay the insured's claim;

(c)    the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

18

(d)     the insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e)     if . . . intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*S & W Properties, Inc. v. American Motorists Ins. Co.*, 668 So. 2d 529 (Ala. 1995); *see also National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179 (Ala. 1982).

The Alabama Supreme Court has repeatedly held that the plaintiff's burden in a bad faith claim is a heavy one. *Id. National Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982). "In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law." *S & W Properties*, 1995 WL 317675 at * 2; *Bowen*, 419 So. 2d at 1362. Finally, to defeat a bad faith claim, the insurer does not have to show that its reason for denial was correct, but only that it was arguably correct. *Liberty Nat'l Life Ins. v. Allen*, 699 So. 2d 138, 143 (Ala. 1977).

Estes has presented no evidence in his opposition to PILIC's motion for summary judgment to support his claim for bad faith. Furthermore, in his argument in response to PILIC's motion for summary judgment, Estes offers no opposition to a judgment as a matter of law on this claim. Accordingly, because no reasonable jury could possibly find in favor of Estes on his claim for bad faith against PILIC, it is due to be dismissed with prejudice.

19

### 3.  Negligence.

Estes asserts a claim of negligence against PILIC for its alleged delay in payment of his insurance benefit. *Complaint* at ¶¶ 20-22. However, no cause of action exists in Alabama for the negligent or wanton handling of an insurance claim. *Kervin v. Southern Guaranty Ins. Co.*, 667 So. 2d 704 (Ala. 1995). In his argument in response to PILIC's motion for summary judgment, Estes offers no opposition to a judgment as a matter of law on his negligence claim. *See Response I.*

Accordingly, PILIC is due judgment as a matter of law on Estes's claim for negligence, and the claim is due to be dismissed with prejudice.

### 4.  Intentional Infliction of Emotional Distress.

Estes asserts a claim for intentional infliction of emotional distress against PILIC for its alleged delay in payment of his insurance benefit. *Complaint* at ¶¶ 17-19. Under Alabama law, there is no distinction between intentional infliction of emotional distress and outrage. *Ex parte Lumberman's Underwriting Alliance*, 662 So. 2d 1133, 1134 n.1 (Ala. 1995) ("The tort of outrage encompasses both intentional and reckless infliction of severe emotional distress"). On January 6, 1997, the court dismissed Count VI of Estes's complaint as to his claim for outrage. Estes does not dispute that the court's order effectively dismissed his claim for intentional infliction of emotional distress. *Response I* at 1.

Accordingly, the court's dismissal of Count VI of Estes's complaint effectively dismisses Estes's claim under Count III for intentional infliction of emotional distress with prejudice.

### 5.   Fraud.

Estes asserts a claim for fraud against PILIC for its alleged delay in payment of his insurance claim. *Complaint* at ¶¶ 23-25. In Alabama, fraud is defined by statute as follows:

> Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

Ala. Code § 6-5-101 (1975). A plaintiff must prove each of the elements of a prima facie case of fraud: (1) the defendant had a duty to speak the truth; (2) the defendant made a false representation of an existing material fact, made intentionally, recklessly or innocently; (3) the plaintiff took action in reliance upon the false representation; and (4) as a proximate result of such reliance, the plaintiff suffered damages. *Allen*, 699 So. 2d at 141; *see also Intercorp, Inc. v. Penzoil Co.* 877 F.2d 1524 (11th Cir. 1989).

In his opposition to PILIC's motion for summary judgment, Estes has presented no evidence to support his claim for fraud. Furthermore, in his argument in response to PILIC's motion for summary judgment, Estes offers no opposition to a judgment as a matter of law on his fraud claim against PILIC. Accordingly, because no reasonable jury could possibly find in favor of Estes on his claim for fraud against PILIC, it is due to be dismissed with prejudice.

### B.   Defendant National Financial Insurance Company.

#### 1.   Breach of Contract.

Estes alleges that NFIC breached the insurance contract between them. *Complaint* at ¶¶ 5-12. He seeks compensatory damages, including compensation for mental anguish, and punitive damages. *Id.* at ¶¶ 11-12. As with PILIC, NFIC never denied or refused to pay

21

benefits under the contract, and, in fact, NFIC did pay Estes's claim under the contract between them. However, the contract between Estes and NFIC provides, "Indemnities payable under this policy will be paid as we receive proof of loss." *Response II* at Exhibit B, p. 17.

NFIC first received a statement of Estes's hospital charges on January 17, 1996. On February 21, 1996, NFIC received an itemization of charges from the hospital. On March 18, 1996, NFIC received a statement of charges from Estes's treating physician. On October 8, 1996, NFIC had all the medical records it required to process Estes's claim. On October 16, 1996, NFIC received information about Estes's overlapping coverage. On November 11, 1996, and November 18, 1996, NFIC processed Estes's claim. Then, on November 25, 1996, the hospital received payment from NFIC. Therefore, summary judgment in favor of NFIC is not appropriate on the issue of whether NFIC breached the explicit terms of its contract with Estes, which provides that claims will be paid upon receipt of proof of loss.

However, for the reasons stated above with regard to the contract with PILIC and Estes, notwithstanding Estes's assertion to the contrary, the court will not insert a condition into the explicit written contract between NFIC and Estes to pay claims "without unreasonable delay." *See supra* at III-A-1.

Estes seeks to recover damages for mental anguish allegedly resulting from a delay in payment of his claim. However, Estes never had any reason to believe that NFIC would not eventually pay his claim. Additionally, Estes's coverage by NFIC was largely duplicate coverage, and Estes admits that he fully expected that PILIC would eventually pay the same claim. Therefore, for the reasons stated above with regard to Estes's breach of contract

22

claim against PILIC, under Alabama law, Estes is not due to recover mental anguish damages on his breach of contract claim against NFIC. *Id.*

Likewise, because Estes cannot maintain an action for fraud against NFIC, and for the reasons stated above with regard to Estes's breach of contract claims against PILIC, Estes is not entitled to punitive damages on his breach of contract claim against NFIC. *Id.; see infra* III-B-5. Accordingly, if Estes can prove a breach of the explicit terms of his contract with NFIC, then he is due to recover his actual damages, but not punitive damages or mental anguish damages.

### 2. Bad Faith.

Estes asserts a claim of bad faith against NFIC for its alleged delay in payment of his claim. *Complaint* at ¶¶ 13-16. Unlike his response to PILIC's motion for summary judgment, in response to NFIC's motion for summary judgment, Estes opposes judgment as a matter of law on his claim for bad faith. *Response II* at 14-21. Estes argues that NFIC committed bad faith when it allegedly failed to investigate his claim. *Id.*

The Alabama Supreme Court has held that, in an action for bad faith, the plaintiff must prove an "intent to injure" on the part of the insurer. *Coleman v. Gulf Life Ins. Co.*, 515 So. 2d 944, 946 (Ala. 1987). Considering all the undisputed facts and construing the disputed facts in a light most favorable to Estes, he cannot prove, as a matter of law, that NFIC operated with an "intent to injure" him.

Estes relies upon *Continental Assurance Co. v. Kountz*, 461 So. 2d 802, 808 (Ala. 1984), for the proposition that NFIC committed bad faith because it "intentionally refused to discover whether its refusal to pay had a lawful basis." *Response II* at 15. However, *Kountz*

23

is a very different case factually from the one at bar. In *Kountz*, the insurer denied its insured's claim three times, despite overwhelming evidence of a valid claim. *Kountz*, 461 So. 2d at 808. In this case, NFIC never denied Estes's claim, but rather NFIC paid Estes's claim once it assimilated the information it required. In *Kountz*, the insurer actively sought information upon which it could deny the claim, but failed to request information from the treating physician, which would have substantiated the claim. *Id.* In this case, NFIC's only source of information was from Estes's health care providers, information which it sought and received. Whereas the court in *Kountz* found evidence of "intentional" failure to determine the validity of its claim, no such evidence exists in this case. *Id.*

Estes also relies upon *Livingston v. Auto Owners Ins. Co.*, 582 So. 2d 1038 (Ala. 1991), for the proposition that "NFIC's processing of Estes's claim amounts to a denial of his claim." *Response II* at 19. In *Livingston*, the court found that the insurer had continued to investigate the circumstances of its insured's fire loss in hopes of finding a reason to deny the claim. *Livingston*, 582 So. 2d at 141-42. In *Livingston*, the insurer took redundant statements from the insured and did not offer to adjust the claim until after the insured sued. *Id.* at 1041-42. In *Livingston*, the insurer continued its investigation based solely on unsupported suspicions and hopes that it would turn up evidence that the insured started the fire. *Id.* Unlike *Livingston*, in this case, NFIC never denied Estes's claim, NFIC never sought redundant information, and Estes presents no evidence that NFIC ever sought information based upon "unsupported suspicions and hopes that it would turn up evidence" that his claim was not valid.

The facts of this case are more like those in *Coleman supra.* In *Coleman*, the insured incurred medical expenses, and two days later, contacted his agent in order to file a claim. *Coleman*, 514 So. 2d at 945. Because the policy was new, it did not appear on the company's register for almost four more months. *Id.* Then, the insurer did not pay its claim for another four months, despite the insured's intervening lawsuit for bad faith. *Id.* at 945-46. Notwithstanding the eight month delay, the court in *Coleman* affirmed the summary judgment on the bad faith claim for lack of evidence of "intent to injure" by the insurer. *Id.* at 947.

Another case factually similar to this case is *Blue Cross and Blue Shield of Ala. v. Granger*, 461 So. 2d 1320 (Ala. 1984). In *Granger*, the insured's claim was initially rejected because, on the face of the claim, it appeared that it could not be processed. *Id.* at 1323. The claim was not paid until one year and three months later. *Id.* at 1322. A computer error and other inefficiencies on the part of the insurer caused the valid claim to be mishandled. *Id.* at 1322-25. Even so, the court in *Granger* rejected the insured's claim for bad faith failure to investigate because, at most, the evidence only indicated mistake or negligence in the defendant's investigation of the claim. *Id.* at 1328.

Just as in *Coleman* and *Granger*, the evidence in this case indicates that NFIC may not have paid Estes's claim promptly, that NFIC may have operated inefficiently, and even that NFIC made mistakes in processing Estes's claim. However, construing all the evidence in a light most favorable to Estes, no reasonable jury could find that NFIC acted with "intent to injure" Estes. Accordingly, as a matter of law, Estes's claim of bad faith against NFIC is due to be dismissed with prejudice.

### 3.    Negligence.

Estes asserts a claim of negligence against NFIC for its alleged delay in payment of his insurance benefit. *Complaint* at ¶¶ 20-22. However, as stated above, no cause of action exists in Alabama for the negligent or wanton handling of an insurance claim. *Kervin*, 667 So. 2d at 704-706. Furthermore, in his argument in response to NFIC's motion for summary judgment, Estes offers no opposition to a judgment as a matter of law on his negligence claim. *See Response II.*

Accordingly, NFIC is due judgment as a matter of law on Estes's claim for negligence, and the claim is due to be dismissed with prejudice.

### 4.    Intentional Infliction of Emotional Distress.

Estes asserts a claim for intentional infliction of emotional distress against NFIC for its alleged delay in payment of his insurance benefit. *Complaint* at ¶¶ 17-19. For the reasons stated above with regard to Estes's claim against PILIC, the court's dismissal of Count VI of Estes's complaint effectively dismisses with prejudice Estes's claim against NFIC under Count III for intentional infliction of emotional distress. *See supra* III-A-4.

### 5.    Fraud.

Estes asserts a claim for fraud against PILIC for its alleged delay in payment of his insurance claim. *Complaint* at ¶¶ 23-25. However, Estes has presented no evidence in his opposition to NFIC's motion for summary judgment to support his claim for fraud against NFIC. Furthermore, in his argument in response to NFIC's motion for summary judgment, Estes offers no opposition to a judgment as a matter of law on this claim. Therefore,

26

because no reasonable jury could possibly find in favor of Estes on his claim for fraud against NFIC, it is due to be dismissed with prejudice.

## IV. Conclusion.

PILIC's motion for summary judgment is due to be granted as to all claims against it except Estes's claim for breach of contract. Likewise, NFIC's motion for summary judgment is due to be granted as to all claims against it except for Estes's claim for breach of contract. In order to prevail on his breach of contract claims, Estes must prove a breach of the explicit terms of his written contract with PILIC and/or NFIC, not breach of any unwritten terms such as payment "without unreasonable delay." Estes's recovery on his breach of contract claims against PILIC and NFIC is limited to any proven actual damages, but not punitive damages or mental anguish damages.

Done, this **22nd** of January, 1998.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

27